Marc E. Kasowitz (mkasowitz@kasowitz.com)
Charles M. Miller (cmiller@kasowitz.com)

JUDGE KAPLAN

OFFICE COPY

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
1633 Broadway
New York, New York 10019
Tel:    (212) 506-1700
Fax:    (212) 506-1800

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------- x



10 CIV 0124

RECEIVED
JAN 07 2010
U.S.D.C. S.D. N.Y.
CASHIERS

ICONIX BRAND GROUP,
INCORPORATED,

                        Plaintiff,

            - against -

MERRILL LYNCH, PIERCE, FENNER &
SMITH, INCORPORATED

                        Defendant.

-------------------------------------------------------- x

Case No. _____

**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Iconix Brand Group, Incorporated ("Iconix" or "Plaintiff"), for its complaint

against Merrill Lynch, Pierce, Fenner & Smith, Incorporated ("Merrill" or "Defendant"), alleges

as follows:

## PRELIMINARY STATEMENT

1.      This action arises from Merrill's fraud and egregious abuse of its position as an

investment banking firm entrusted to guide Iconix, a fashion brand management company,

through the financing and cash management for Iconix's business. After Iconix paid Merrill

millions of dollars in fees and commissions to raise capital necessary for Iconix's business,

Merrill fraudulently induced Iconix to place over $100 million of that capital -- capital vital to the operation of Iconix's business -- in securities that Merrill falsely represented to be safe, highly-liquid auction rate securities ("ARS") ideal for cash and "liquidity management." As Iconix later discovered, the ARS Merrill sold Iconix were not "cash and liquidity management" instruments but were, instead, a component of a complex, multi-part derivative scheme through which Merrill itself profited and through which it assisted its more lucrative clients to offload losses from exotic, risky credit derivatives onto unsuspecting investors such as Iconix.

2.    Beginning in 2005, Iconix, as a brand manager, sought to assemble a portfolio of high-profile apparel and home brands, license those brands to traditional wholesalers, and provide marketing and brand development services to its licensees. Because Iconix did not have the knowledge, sophistication, or expertise to raise and manage the large amounts of cash needed for its acquisition strategy, Iconix engaged Merrill and another large "money center" bank to advise Iconix on developing, financing, and managing the company's capital structure. Iconix was candid with Merrill that it did not have the knowledge, sophistication, or expertise to do so on its own. Merrill repeatedly assured Iconix that it understood its role as advisor, and would provide the best possible guidance to Iconix.

3.    Over the course of the next year, Merrill provided Iconix with its first term loan, led the underwriting of Iconix's first major public offering of stock, advised on Iconix's current loan facility, and led the underwriting of Iconix's major offering of convertible bonds. Merrill participated in raising nearly $640 million of capital for Iconix, for which Merrill was paid over $12 million in fees and commissions between December 2006 and June 2007. As a lead underwriter, Merrill conducted extensive due diligence and gained intimate knowledge of

2

Iconix's business. Merrill was intimately familiar with the terms of each of Iconix's financings, including contractual terms restricting Iconix to investing only in "cash equivalents."

4.      Merrill advised Iconix to consult with Merrill's Institutional Advisory Division with respect to managing the proceeds of its financings. Merrill represented to Iconix that the Division provided cash management services to Merrill's investment banking clients and, as part of the same Merrill family, they could together provide seamless guidance to Iconix for raising and managing cash for its acquisition business. Merrill's cash managers separately emphasized these same points. Based upon Merrill's representations, Iconix engaged Merrill's cash managers in or around June 2007.

5.      Merrill's cash managers advised and assisted Iconix in, among other things, establishing cash management guidelines. Merrill supplied Iconix with Merrill's own "Sample Investment Guidelines," which Merrill represented as consistent with Iconix's investment needs. At the top of those sample guidelines, Merrill represented in writing -- in italics -- that "*The following is a sample set of guidelines which could be implemented by a corporation or other institution with a very low risk tolerance. These guidelines emphasize safety and liquidity above all other considerations.*" Merrill exchanged drafts of the guidelines with Iconix and provided comments and guidance.

6.      Merrill's sample guidelines included a list of "Permissible Investments" that included ARS. ARS were long-term interest-bearing instruments created and sold by Merrill and other investment firms that were traded at periodic auctions (typically held every 7, 14, or 28 days), at which their interest rates were reset and at which investors were told they would be able to easily liquidate their investments. However, what Iconix and other investors were not told by

3

Merrill was that in the event there were more sellers than buyers, an ARS auction would "fail" --
*i.e.*, investors seeking to sell their ARS would be unable to do so. Iconix also was not told that
although Merrill's ARS auctions routinely failed to draw sufficient bidders, Merrill itself secretly
stepped in repeatedly to conceal those failures by buying the unwanted ARS for its own
"inventory." However, Merrill had a secret preset limit on the dollar amount of ARS it would
purchase for its inventory, after which it would stop "supporting" the ARS auctions and leave
investors unable to liquidate the ARS and recover their cash.

7.     ARS came in various forms with varying liquidity and credit risks. Some ARS
were issued by municipalities that would pay interest and repay principal to the ARS investors.
Other ARS were issued by trusts holding pools of United States government-guaranteed student
loans that served as the source of interest and principal payments for the ARS. Accordingly,
these ARS were subject to municipal and U.S. government credit risk, respectively. However, a
small portion of the ARS market -- less than 5 percent -- were issued by empty shell "special
purpose vehicles" or "SPVs" which, through their complex "structures," were exposed to the
immeasurable and unknowable risks of exotic, esoteric credit derivatives -- including so-called
"structured debt products" tied to subprime mortgages.

8.     Iconix advised Merrill that it had no prior experience with ARS, did not know
what they were, and did not have the knowledge or expertise to evaluate whether ARS would be
suitable for Iconix. Merrill represented to Iconix that its ARS were "safe," "money market-like"
investments collateralized by safe, highly-rated, and highly-liquid securities, and advised that
ARS would be ideal for Iconix's cash management. Merrill represented to Iconix that ARS were
"highly liquid" because they could be sold at auctions every 28 days. Moreover, when Iconix
noted that the 28-day auction period could pose a problem if Iconix needed capital immediately

4

for an acquisition, Merrill responded that this was no concern because Merrill provided "absolute daily liquidity" for its ARS.

9.      Merrill concealed from Iconix that Merrill brokered ARS that would expose purchasers to losses from exotic, high-risk derivatives, and represented falsely to Iconix that the ARS Merrill sold were collateralized by secure, highly-rated and highly-liquid assets. Merrill also concealed from Iconix that ARS auctions could "fail," that auctions for Merrill's ARS often did fail to draw sufficient bidders, and that Merrill routinely covered up those failures by buying ARS for its own inventory. Merrill also concealed that it had a preset cutoff at which it would stop buying ARS, leaving investors unable to recover their cash.

10.     At all times Merrill, through its participation in raising hundreds of millions of dollars of capital for Iconix's business, knew that Iconix had raised that money for the purpose of acquiring fashion brands for Iconix's portfolio. Merrill knew that the funds Iconix raised were vital to Iconix's business, and that it was essential that those funds remain safe and liquid at all times.

11.     In June 2007, Iconix, based upon Merrill's representations and omissions, adopted a set of investment guidelines based largely upon Merrill's sample, and included ARS in those guidelines. Over the next five weeks in June and July 2007, Merrill sold Iconix more than $100 million worth of ARS, including tens of millions of dollars of ARS exposed to losses from exotic, high-risk derivatives.

12.     On July 31, 2007, a Merrill-managed auction for ARS called "Anchorage" failed to draw enough bidders. Although Merrill concealed the failure by buying the unwanted ARS, Merrill determined that it would not do so again. Merrill knew that the collapsing subprime

mortgage market was wreaking havoc on the market for the complex derivative securities to which Anchorage was exposed, and did not want to buy any more of those extremely risky ARS. Indeed, Merrill determined to dump as many of those ARS as it could from the inventory it was already holding.

13.     On August 2, 2007 -- 26 days before the next scheduled Anchorage auction -- Merrill advised Iconix that the Anchorage ARS had "come up for sale." Merrill failed to disclose that those securities were not "up for sale" in an auction but, rather, that Merrill was looking to sell those securities directly out of its own inventory. Merrill also failed to disclose that it would not prop up the next Anchorage auction on August 28, 2007 and, accordingly, that Iconix was virtually guaranteed to be stuck with those securities -- the value of which was certain to be decimated -- as of that date. Based upon Merrill's representations regarding ARS, and its omissions regarding the Anchorage ARS, Iconix purchased $13 million of those securities. Four days later, Merrill abandoned the market for certain high-risk ARS, allowing 53 auctions to fail, including the Anchorage auction on August 28, 2007.

14.     Merrill's decision to abandon the ARS market left investors stranded with $4 billion of illiquid ARS, including Iconix's $13 million of Anchorage ARS, the value of which has been decimated by losses on exotic, esoteric credit derivatives -- including securities tied to subprime mortgages -- risks Merrill concealed from Iconix at the time it sold Iconix those ARS.

15.     To the extent any investor possessed the sophistication, specialized mathematical tools, and financial engineering expertise to analyze the risks of ARS exposed to an unidentified hodgepodge of risky, complex, and illiquid credit derivatives tied to subprime mortgages and mysterious "structured debt products", Merrill knew -- and Iconix made clear -- that Iconix was

6

not such an investor.  Rather than using its knowledge of Iconix's limited financial sophistication to serve Iconix's best interests -- as it represented it would do -- Merrill, knowing Iconix was relying on Merrill's advice, took full advantage of its position as a trusted advisor to benefit itself by unloading illiquid, high-risk ARS onto its unsuspecting client.

16.     Iconix now seeks to recover the damages it has suffered as a result of Merrill's fraud, in the amount of at least $13 million, as well as punitive damages.

## PARTIES

17.     Iconix is a corporation created and existing under the laws of the State of Delaware with its principal place of business in New York.  Iconix is a brand management company engaged in licensing, marketing, and brand development for its portfolio of fashion and home brands.  Iconix licenses its brands to leading retailers and manufacturers worldwide.

18.     Merrill is a corporation created and existing under the laws of the State of Delaware with its principal place of business in New York.  Merrill is a broker-dealer registered with the United States Securities and Exchange Commission under Section 15(b) of the Securities Exchange Act of 1934 ("Exchange Act") and engages in a nationwide securities business.

## JURISDICTION AND VENUE

19.     This Court has jurisdiction over the subject matter of this action pursuant to 15 U.S.C. § 78aa and 28 U.S.C. §§ 1331 and 1367.

20.     Venue in this District is proper under 28 U.S.C. § 1391(b) inasmuch as a

substantial part of the events or omissions giving rise to the claims occurred in this District and

the defendant is subject to personal jurisdiction in this District.

## STATEMENT OF FACTS

**Iconix Engages Merrill To Advise**
**Iconix On Its Development And Financing**

21.     Iconix is the successor to Candie's, Inc. ("Candie's"), a wholesaler and distributor

of shoes and other fashion products. In 2005, Candie's changed its name to Iconix and

transformed its business strategy from that of a traditional wholesaler to "brand manager." As a

brand manager, Iconix would seek to purchase the rights to high-profile fashion and home

brands, license those brands to manufacturers, and provide marketing and brand development

services to its licensees.

22.     Prior to becoming Iconix, Candie's did not employ "cash management"

personnel, nor did it engage an outside institution to provide "cash management" services. After

its transformation, Iconix's business strategy required it to raise and manage hundreds of

millions of dollars of acquisition capital with which to acquire high-profile brands for its

portfolio. Because Iconix did not have the knowledge, sophistication, or expertise to raise and

manage the acquisition capital needed to pursue its business strategy, Iconix sought to engage a

"money center" bank to provide those services.

23.     In early 2006, Iconix solicited proposals from several "money center" banks,

including Merrill, to provide banking and advisory services. In or about January 2006,

representatives of Iconix, including Iconix's Chief Financial Officer, Warren Clamen

("Clamen") and Iconix's President and Chief Executive Officer, Neil Cole ("Cole"), met with

8

representatives of Merrill, including Merrill's Managing Director of U.S. Retail, Lisa Clyde ("Clyde"). Clamen and Cole explained Iconix's business strategy to Clyde, and emphasized that Iconix's business strategy would rely on ready access to acquisition capital to compete effectively for desirable brands. Clamen and Cole were candid that Iconix sought the advice, guidance, and assistance of a "money center" bank because Iconix did not employ personnel with the knowledge or expertise to develop, finance, and manage such a large capital structure. Iconix made clear that it would rely on its bankers for advice with respect to financing and managing its acquisition capital.

24.     Clyde acknowledged that Merrill understood Iconix's limitations and expectations. Clyde represented that Merrill would provide unparalleled service to Iconix if selected as Iconix's primary banker. In or about June 2006, based upon Merrill's representations of its financial sophistication and expertise, and its purported understanding of Iconix's business goals, limitations, and expectations, Iconix engaged Merrill as its primary banker. In a June 9, 2006 press release that Merrill reviewed and approved, Iconix announced that it "is working with Merrill Lynch & Co. to explore strategic acquisitions within and outside of the apparel industry." Iconix stated that it had engaged Merrill because "As we continue with our growth strategy to build a multi-billion dollar brand portfolio and global licensing business, we will require an array of debt and equity expertise and the ability to expand our deal flow to a broader spectrum of industries," and "we are very excited to be working with Merrill Lynch and moving forward with our strategic growth plans."

**December 2006: Merrill Advises**
**Iconix On Its First Major Stock Offering**

25.     In or about November 2006, Clamen and Cole consulted with Merrill's Clyde and representatives of another bank (the "Second Bank") about raising cash to facilitate its purchase of several high-profile brands. Based on Clyde's advice and guidance, Clamen engaged Merrill to lead Iconix's first substantial public offering of common stock (the "2006 Offering"). As "lead book runner," Merrill led and advised Iconix on all aspects of the transaction, including structure, size, and price, and conducted extensive due diligence of Iconix. Among other things, Merrill reviewed every aspect of Iconix's business. Merrill became intimately familiar with Iconix's past business, its current financial condition, its future strategy, and the level of financial sophistication of Iconix's personnel.

26.     In addition to its other services, Merrill advised Iconix as to how to describe the 2006 Offering in its public disclosures. Merrill advised that Iconix should not state specifically that it would use the proceeds of the 2006 Offering to acquire specific brands, because such a statement could raise issues if those acquisitions were not completed. Instead, Merrill advised Iconix to state only that it would use the proceeds for "general corporate purposes." Merrill assured Iconix that the broader description was appropriate because Iconix's brand acquisitions were consistent with the company's "general corporate purposes."

27.     Clyde also advised Clamen to consult with representatives of Merrill's Global Institutional Advisory Division (the "Institutional Advisory Group"), which Clyde described as providing "cash management" advice and services to Merrill's priority clients. Clyde represented that because Merrill's Institutional Advisory Group and the investment bankers were all part of the same Merrill family, they could combine to provide seamless guidance in

10