developing, financing, and managing Iconix's capital structure. Clamen was not adverse to engaging Merrill's Institutional Advisory Group as he had previously worked with Merrill's private banking and investment group in connection with a modest working capital account.

28. On or about December 13, 2006, Merrill led the underwriting of Iconix's issuance of approximately 9 million shares of new common stock, in addition to which Iconix sold approximately 4 million shares of existing stock. The sales generated approximately $190 million in cash for Iconix.

**March 2007: Merrill Advises Iconix On Its First Major Debt Facility**

29. In or around March 2007, Iconix determined to pursue several new acquisitions and consulted with Merrill and its Second Bank about financing. While Merrill proposed a broad, "whole company" financing whereby Iconix would put up virtually the entire company as collateral, Iconix's Second Bank proposed a more conservative term loan facility. Although Iconix accepted its Second Bank's advice, Clamen continued to consult with Merrill's Clyde in connection with the creation of Iconix's new term loan facility (the "Term Facility") with the Second Bank (the "Term Lender"). Merrill reviewed drafts of the relevant documents (the "Term Facility Contracts" or "Contracts") and proposed additions and deletions, many of which Iconix and the Term Lender incorporated into the final Contracts. Iconix allowed Merrill to review and advise on drafts of the relevant Term Facility documents because Merrill wanted to ensure that nothing in the Term Facility documents would create a problem in future transactions between Iconix and Merrill. Iconix and the Term Lender finalized the Contracts and launched the Term Facility on or about March 30, 2007.

30. Under the Contracts, the Term Lender committed to lend up to $212.5 million. As is customary, the Term Lender insisted on covenants (the "Term Loan Covenants" or "Covenants") restricting how Iconix could use its cash; the types of securities Iconix could purchase; the amount of debt Iconix could take on; and the changes Iconix could make to its business. The Term Loan included a covenant (the "Cash Equivalent Covenant") restricting Iconix to purchasing only (i) certain U.S. government securities; (ii) Certificates of Deposits from certain U.S. banks maturing in 6 months or less; (iii) highly rated commercial paper maturing in 6 months or less; (iv) repurchase agreements for certain U.S. government securities maturing in 30 days or less; (v) certain highly rated municipal debt maturing in 1 year or less; (vi) certain securities backed by a qualifying letter of credit; or (vii) shares of money markets that invested in the foregoing types of securities.

31. Because Merrill reviewed and commented on the Term Loan Contracts, Merrill knew of the Term Loan Covenants -- including the Cash Equivalent Covenant -- and knew that Iconix's breach of that or any other Covenant could have dire consequences. Among other things, Merrill knew that a breach would allow the Term Lender to "accelerate" the Term Facility -- *i.e.*, the Term Lender could demand full and immediate repayment of the facility, which Merrill knew could devastate Iconix.

**June 2007: Merrill Advises Iconix On**
<u>**Financing A Significant Brand Acquisition**</u>

32. In or about June 2007, Iconix engaged in negotiations to acquire Official Pillowtex LLC ("Pillowtex"), a licensing company owning a large portfolio of home brands including linen makers Cannon, Fieldcrest, and Royal Velvet. Among the terms being negotiated were purchase price and the form in which Iconix would pay for Pillowtex. Although

Iconix proposed paying a substantial portion with Iconix stock, Pillowtex insisted on virtually all cash. Iconix did not have enough cash for such a transaction and consulted with Merrill's Clyde and its Second Bank about raising the necessary funds. Merrill knew of Iconix's negotiations for Pillowtex and the demand that Iconix pay cash and Iconix made clear that it was seeking financing for that transaction.

33. Merrill proposed a complex financing that Merrill represented would provide Iconix with the most capital at the lowest cost with the least amount of risk (the "Merrill Convertible Note Transaction"). First, Merrill proposed that it would underwrite Iconix's issuance of approximately $200 million of notes (the "Notes"). Merrill proposed that these Notes would be "convertible" -- i.e., investors could, under certain circumstances, convert the Notes to common stock. Second, because the conversion of the Notes into stock could dilute the value of Iconix's existing shares, Merrill proposed to sell Iconix a form of insurance known as a "hedge" to protect Iconix from a drop in the stock price and possible future dilution when settled.

34. As Merrill knew, Iconix did not have the knowledge or expertise to evaluate the Merrill Convertible Note Transaction and relied upon Merrill's advice. Merrill assured Iconix that Merrill had used the proposed structure successfully for other clients. Based upon Merrill's advice and expertise, and the fact that Merrill was fully aware of the restrictions placed on Iconix's business under the Term Facility, Iconix agreed to engage Merrill to underwrite the Merrill Convertible Note Transaction.

**Merrill Induces Iconix To Engage**
**Merrill's Cash Managers To Manage The**
**Cash From The Merrill Convertible Note Transaction**

35.  During Iconix's and Merrill's discussions on the Merrill Convertible Note Transaction, Iconix's negotiations to acquire Pillowtex were delayed. Iconix proceeded with the Merrill Convertible Note Transaction on the expectation that the Pillowtex acquisition would close. Because it appeared likely that Iconix would be holding more than $280 million of acquisition capital pending resolution of the Pillowtex negotiations, Clyde again advised Clamen to consult with Merrill's Institutional Advisory Group, which Clyde had represented was part of the same Merrill family, and would use Merrill's knowledge of Iconix's business to enable the Institutional Advisory Group to advise Iconix seamlessly.

36.  In or around June 2007, Clamen was introduced to Todd DiScala ("DiScala"), Senior Vice President in Merrill's Institutional Advisory Group. Clamen was candid with DiScala that Iconix would need Merrill's advice, guidance, and assistance to manage the proceeds from the Merrill Convertible Note Transaction because Iconix did not have the necessary knowledge or expertise. Clamen explained that those funds -- in fact, all of Iconix's cash -- were essential acquisition capital that had to be kept safe and entirely liquid. DiScala responded that he was a "specialist" in "cash management" for publicly-held corporations, was acquainted with Iconix's business, and could provide the advice and expertise Iconix needed. Based on Merrill's representations, Iconix engaged Merrill's Institutional Advisory Group in or about June 2007 to manage roughly half of the proceeds from the Merrill Convertible Note Transaction. With such a substantial sum involved, Iconix engaged cash managers from its Second Bank to manage the balance.

37. The Merrill Convertible Note Transaction closed on or about June 20, 2007, providing roughly $280 million in net proceeds before Iconix paid Merrill for the hedge transaction -- and approximately $205 million after the hedge transaction -- roughly half of which Iconix entrusted to Merrill's cash managers. Merrill received roughly $22.5 million in net proceeds on their portion of the hedge transaction.

**Merrill Advises Iconix On Creating And Adopting Investment Guidelines**

38. Upon engaging Merrill's cash managers, Clamen informed DiScala that Iconix had never had need to develop investment guidelines. Clamen advised DiScala that Iconix did not have the expertise to prepare such guidelines. DiScala supplied Clamen with "Sample Investment Guidelines" that Merrill had prepared (the "Merrill Guidelines"). The first paragraph of the Merrill Guidelines represents in writing -- in italics -- that "*The following is a sample set of guidelines which could be implemented by a corporation or other institution with a very low risk tolerance. These guidelines emphasize safety and liquidity above all other considerations.*" Next were the Merrill Guidelines' "Objectives": "(1) To preserve the principal value of the investment portfolio. (2) To maintain liquidity to meet anticipated cash flows. (3) To achieve the best possible yields after tax consistent with capital preservation and liquidity requirements." Clamen found Merrill's emphasis on "very low risk tolerance" and "safety and liquidity" and the Objectives consistent with Iconix's goals.

39. Next, the Merrill Guidelines set forth a list of "Permissible Investments." Clamen reviewed this section which appeared to be consistent with the Cash Equivalent Covenant of the Term Loan Facility because it included investments such as: (i) securities issued or insured by the United States government; (ii) highly rated collateralized "repurchase" agreements;

15

(iii) highly rated commercial paper and corporate debt; (iv) securities issued by certain banks; (v) highly rated asset-backed securities; and (vi) money market funds and enhanced cash plus funds. However, Merrill also included "Auction Rate Securities," something with which Clamen had no experience.

40. Clamen informed DiScala that he did not know what ARS were, had no prior experience with ARS, and did not have the expertise to evaluate whether ARS were suitable for Iconix. DiScala represented that ARS were suitable for Iconix because ARS were akin to "money market" securities, which are commonly understood to be debt instruments issued by private organizations, governments, and government agencies that are traded in the "money center" financial markets, and that generally mature within one year or less.

41. Consistent with his analogy to "money market" securities, DiScala represented that ARS were short-term, high quality issuances of private organizations that were collateralized by assets rated A1 and P1 by the Nationally Recognized Statistical Rating Organizations such as Moody's Investors Services and Standard & Poor's. DiScala represented that ARS were highly liquid because they could be sold at auctions held every 28 days. When Clamen responded that he was concerned that the 28-day waiting period might create a problem if Iconix needed the money immediately to close an acquisition, DiScala responded that Iconix would always be able to liquidate its ARS immediately because Merrill ensured "absolute daily liquidity" for ARS sold to its cash management clients.

42. DiScala and Clamen exchanged mark-ups of the Merrill Guidelines and DiScala provided comments and further advice to Clamen. Iconix's Second Bank also provided advice regarding appropriate investment guidelines and ARS consistent with Merrill's representations.

On or about June 20, 2007, Iconix adopted a set of investment guidelines (the "Iconix Guidelines") substantially identical to the Merrill Guidelines DiScala had provided. Based upon DiScala's representations and omissions, Iconix retained ARS as "Permissible Investments" as Merrill advised.

43.     On or about June 22, 2007, Iconix began purchasing ARS through Merrill's proprietary "Liquidity Management System" and through a similar platform provided by its Second Bank. Typically, DiScala would telephone Clamen, describe the ARS coming up for auction that day and the interest rates Merrill expected those securities to pay, and then recommend that Iconix buy those ARS from Merrill. Clamen would accept DiScala's recommendation, and DiScala would bid on the ARS for Iconix. Upon completing a transaction, Merrill provided Iconix with an electronic "trade ticket." The top of each trade ticket bore a large Merrill logo and, in large letters, the words "Liquidity Management System." Iconix also purchased ARS through its Second Bank based on that institution's recommendations to Iconix, which were consistent with those made by Merrill.

44.     Although the Iconix Guidelines had included many different types of permissible investments, DiScala only recommended ARS. Clamen never rejected a single recommendation.

**Merrill's Representations That ARS Were
"Safe" And "Suitable" For Iconix Were False**

45.     ARS are long-term interest-bearing instruments that were traded at periodic auctions (typically, every 7, 14, or 28 days). At these auctions, ARS interest rates were reset and investors were supposed to be able to easily liquidate their investments. Brokers marketed ARS as advantageous to investors, representing that ARS were as safe and liquid as money market instruments, but with a slightly higher yield. Borrowers issuing ARS benefited because they

17

were able to obtain long-term financing at lower, short-term interest rates. In the event holders of ARS seeking to sell their securities at auction outnumbered investors bidding for those securities, the auction would be said to "fail," meaning that none of the ARS holders could sell their ARS until the next scheduled auction.

46. Financial institutions such as Merrill earned fees by playing several different and conflicting roles in the ARS market. For example, financial institutions such as Merrill acted as underwriters of ARS, for which the issuer would pay the institution an underwriting fee. Thereafter, the same financial institution typically acted as manager of the auctions for the ARS, for which the institution would receive another fee. Finally, the same institution would provide buyers for the ARS it underwrote and managed by marketing those ARS to its brokerage clients, from whom it received yet more fees.

47. Among the issuers of ARS were corporations, municipalities, student loan providers, and "closed-end" investment funds. Such issuers made up roughly 95% of the ARS market. The other 5% of ARS ("Derivative ARS") were issued by various types of trusts and off-shore "special purpose vehicles." Many of these issuers of Derivative ARS were empty shells onto which other companies offloaded the risk of losses from risky, illiquid, complex derivatives such as "residential mortgage-backed securities" ("RMBS"), the value of which are tied to *subprime* mortgages and, in many cases, complex "collateralized debt obligations" ("CDOs") -- highly "structured" securities tied by derivatives contracts to layers of risks that are virtually unknowable and beyond the ability of an ordinary investor to understand or evaluate.

48. Because each ARS type was supported by a different type of underlying asset, each had its own risk profile consistent with that of the underlying assets. For example, ARS

issued by municipalities were typically supported by the municipalities' powers to raise revenues through taxes and other types of fees and charges; securities issued by so-called "closed-end" municipal bond funds were supported by the portfolio of the issuing fund; and student loan-based ARS (known as "SLARS") were supported by student loans that carried government guarantees for 97 cents on every dollar under the Federal Family Education Loan Program.

49.     Merrill did not explain to Iconix that there were different types of ARS, each subject to distinct risks. Instead, Merrill presented ARS as a homogenous "money market-like" investment. Merrill represented that ARS were safe like money market investments because ARS were collateralized by A1- and P1-rated assets, as reflected in the high ratings conferred on the ARS themselves. Merrill knew its representations were false as to ARS, generally, and as to certain specific ARS -- dubbed "Asset Backed Capital Committed Securities" or "ABC Securities" (the "ABC ARS") -- that Merrill intended to sell Iconix. ABC ARS were a component of a complex, multi-part derivative loss transference scheme that Merrill concocted to assist highly sophisticated investment professionals in transferring a panoply of virtually unknowable risks onto unsuspecting and unsophisticated money market investors.

50.     Among Merrill's lucrative investment banking clients were so-called "Monoline Insurers." The Monoline Insurers are highly sophisticated institutions that earn fees by providing insurance to investment professionals on their bets on risky and illiquid securities including RMBS and CDOs. To protect themselves, the Monoline Insurers routinely sought "reinsurance" to cover their obligations to pay claims for losses under their insurance contracts. Given the risky securities that the Monoline Insurers insured, it was costly to obtain reinsurance from sophisticated, professional insurers or investors with the expertise and resources to analyze and understand those risks. To secure underwriting business from these lucrative clients, Merrill

19

created complex, multi-part derivative transactions known as "committed capital facilities" through which Merrill could secure for its clients cheap reinsurance from unsophisticated, inexperienced money market investors such as Iconix. ABC ARS were an essential element of Merrill's scheme.

51. Merrill's scheme worked as follows: In return for significant fees, Merrill created an empty shell trust (the "Facility Trust") that would enter into a contract to pay cash on demand to a Monoline Insurer. The Monoline Insurer could use that cash to pay claims for losses on RMBS, CDOs, and other investments it insured. In return for significant fees, Merrill underwrote securities -- ABC ARS -- that the Facility Trust, through Merrill as broker, sold to investors such as Iconix to raise the money made available to the Monoline Insurer.

52. The Facility Trust used the cash paid by investors for the ABC ARS to purchase the A1- and P1-rated assets that Merrill touted as providing collateral to ARS purchasers. However, contrary to Merrill's representations, these assets provided a secure reserve from which to provide funds to the Monoline Insurer -- not the investor. Indeed, at the Monoline Insurer's direction, the Facility Trust would liquidate the A1- and P1-rated assets and turn the cash over to the Monoline Insurer. In return, the Monoline Insurer would transfer to the Facility Trust "preferred shares" (the "Monoline Preferreds") that the insurer itself had issued to replace the A1- and P1-rated assets. When the Monoline Insurer had caused all of the A1- and P1-rated assets to be liquidated and had taken all of the investors' cash, the Facility Trust would dissolve and deliver the Monoline Preferreds to the investors. The ARS investors would be left holding "perpetual" preferred shares for which there is no liquid market and that never mature. Such preferred shares are a far cry from the A1- and P1-rated assets Merrill touted to induce Iconix to purchase ARS.