53.     In light of the foregoing, Merrill's representation that buying ARS from Merrill would be as safe as buying "money market" securities was false. As Merrill knew, Iconix would not be buying a "cash management" investment; rather, Iconix would be selling reinsurance to a Monoline Insurer in return for an ownership stake -- *i.e.*, preferred shares -- in the Monoline Insurer's business. As Merrill knew, such an illiquid, perpetual equity investment was unsuitable for Iconix's acquisition business and would violate the Cash Equivalent Covenant of Iconix's Term Loan Facility. Merrill knew Iconix would not have consented to such an investment.

**Merrill's Representation That
ARS Were "Highly Liquid" Was False**

54.     To induce Iconix to purchase ABC ARS, Merrill represented that those securities were sold through a "highly liquid" auction market and, accordingly, that the liquidity risk to which Iconix would be exposed was that numerous, *bona fide*, third-party bidders would all suddenly stop buying ARS. Merrill's representation was false.

55.     Merrill did not disclose to Iconix that ARS auctions could "fail" if there were more sellers than bidders, and that no ARS holder could sell its ARS in the event of a "failure." Merrill did not disclose that at least as early as June 2007 there were not enough bidders for Merrill's ABC ARS to prevent auctions from failing. Merrill did not disclose that, although numerous auctions had failed to draw sufficient bidders, Merrill had continuously concealed those failures by buying ABC ARS for its own inventory. Accordingly, Merrill failed to disclose that as of June 2007, Iconix's ability to liquidate ABC ARS and recover its cash did not rely on numerous third-party bidders but, instead, relied on one single bidder -- Merrill itself. Of course, a "market" that relies on one single bidder is no market at all and, in any event, cannot be considered "liquid."

56. Merrill also failed to disclose that Merrill placed an internal limit on the amount of ARS it would purchase, and that Merrill would stop buying ARS when it hit that limit. Merrill knew ending its ARS purchases would strand investors with illiquid securities. Merrill also failed to disclose its conflicting roles, or the extent of its financial interest in maintaining the sham ARS market to generate fees for itself. Merrill did not disclose that: (i) Merrill's Monoline Insurer clients paid Merrill substantial fees to structure, underwrite, and market the ABC ARS; (ii) Merrill received substantial fees for managing the auctions; (iii) Merrill's brokerage business reaped substantially higher fees from selling ABC ARS than from selling *bona fide* cash management instruments or other ARS; or (v) Merrill's financial advisors like DiScala reaped significantly higher compensation from selling ABC ARS than *bona fide* cash management investments or other ARS.

57. Merrill also failed to disclose that some ARS were more likely to remain liquid than others following an auction failure. Merrill did not explain that many ARS were structured to pay a "penalty rate" if an auction failed, or that such rates could run as high as 20%. Merrill did not explain that these rates dramatically improved the likelihood that stranded investors would recover their cash because, as has been the case, long-term investors seeking high yields would buy ARS paying high penalty rates from stranded short-term investors. Also, as has been the case, issuers of ARS paying high penalty rates have bought back failed ARS at full value to relieve themselves of the burdensome rate, thereby returning liquidity to stranded investors.

58. Merrill failed to disclose that, by contrast, some ARS pay no penalty rate upon an auction failure and, moreover, some pay even lower interest rates after a failure. Without a penalty rate to induce new purchasers or issuer redemptions, these ARS are far less liquid now that the banks have abandoned the auctions, with many ARS totally frozen for more than 2 years.

Merrill failed to disclose to Iconix that the ABC ARS it intended to sell Iconix were structured with no penalty rate and, accordingly, were likely to be far less liquid than other ARS in the event of an auction failure.

59. In light of the foregoing, Merrill's representation that the ABC ARS it intended to sell Iconix were highly liquid was false because Iconix's ability to liquidate those securities through auctions would depend entirely on Merrill's continuing -- but limited -- purchases and, moreover, in the event of a failed auction, those securities were less liquid than other ARS types. Had Iconix known these facts, it would not have purchased ABC ARS.

**Merrill Ignores The Auctions And Dumps**
**Illiquid ARS Out Of Its Own Inventory Onto Iconix**

60. By July 2007, Merrill knew the RMBS and CDOs insured by Merrill's Monoline Insurer clients were plummeting in value because defaults were increasing on the subprime mortgages underlying those complex derivatives. Knowing that the ABC ARS provided cash, in part, for paying losses on the RMBS and CDOs covered by the Monoline Insurers, Merrill determined at least as early as July 2007 to protect itself from such losses by ending its practice of buying ABC ARS for its own account and dumping as many of those securities as it could onto unsuspecting investors.

61. On July 31, 2007, a Merrill-managed auction for an ABC ARS dubbed Anchorage Finance Sub-Trust II ("Anchorage ARS") failed -- as it had in the past -- to draw sufficient bidders. Although Merrill -- as it had in the past -- concealed the failure by purchasing the Anchorage ARS for its own inventory, Merrill determined that it would not prop up Anchorage ARS auctions in the future.

62. Two days later, on August 2, 2007 -- 26 days before the next scheduled Anchorage ARS auction -- DiScala advised Clamen that Merrill had Anchorage ARS "up for sale." DiScala did not disclose to Clamen that the Anchorage ARS were not up for *auction* on that date, and would not come up for auction for another 26 days. DiScala did not disclose that DiScala was seeking to sell Anchorage ARS out of Merrill's inventory through a secondary market transaction outside the auction process, that the July 31, 2007 Anchorage ARS auction had failed to draw sufficient bidders, or that Merrill had determined not to prop up the next Anchorage ARS auction on August 28, 2007. Accordingly, Merrill did not disclose what Merrill knew to a virtual certainty -- that if Iconix purchased the Anchorage ARS on August 2, 2007, it would not be able to liquidate those ARS and recover its cash in a future auction.

63. Based upon Merrill's prior representations -- which DiScala failed to correct -- and its fresh omissions, Clamen approved Iconix's purchase of $13 million face value of Anchorage ARS through the auction process. Clamen did *not* know that Merrill intended, and did *not* approve, Iconix's purchase of those ARS directly from Merrill's "inventory" in a secondary market transaction.

**Merrill Abandons
The ABC ARS Auctions**

64. On August 6, 2007, four days after offloading the Anchorage ARS onto Iconix, Merrill stopped buying Derivative ARS for its own account. Merrill stopped buying these ARS to reduce its own exposure to losses from various forms of derivatives, including RMBS and CDOs. Without bids from Merrill -- the one bidder upon whom Iconix and other investors had unknowingly depended to liquidate their ARS and recover their cash -- investors were cut off

from their cash and trapped with illiquid ARS. The Anchorage ARS were added to the list of Merrill failures when Merrill refused to buy any Anchorage ARS at the August 28, 2007 auction.

65. By the end of September, Merrill caused a total of 53 Derivative ARS auctions to fail, leaving countless investors holding $4 billion of illiquid Derivative ARS, including ABC ARS. During this period, Iconix's Second Bank also stopped submitting bids for its ARS auctions, including auctions for ARS it had sold to Iconix. At all relevant times, based upon Merrill's recommendations, roughly half of the proceeds from the Merrill Convertible Note Transaction were invested in Merrill-brokered ARS and, based upon Iconix's Second Bank's recommendations, the balance of the proceeds were invested in ARS brokered by that institution.

66. In the midst of the banks' abandoning Derivative ARS in August and September 2007, Iconix and Pillowtex agreed to the material terms of Iconix's acquisition. As the parties had previously discussed -- and, in fact, as Merrill knew had been the reason for the Merrill Convertible Note Transaction -- Iconix would pay substantially all of the purchase price in cash. Accordingly, Iconix advised both Merrill and its Second Bank that it would need to liquidate the ARS and recover the acquisition capital it had raised through the Merrill Convertible Note Transaction to close the Pillowtex acquisition.

67. Iconix's Second Bank provided liquidity for all ARS Iconix had purchased through that institution by purchasing or brokering purchases of those ARS from Iconix. Merrill did not. Merrill brokered purchases for some ARS through auctions and, where it could not do so, purchased only selected ARS from Iconix. Merrill did not repurchase the Anchorage ARS. When Clamen asked DiScala why Merrill would not provide liquidity for the Anchorage ARS, DiScala represented in writing that this was not possible because "Merrill Lynch is not able to

offer a bid on [the Anchorage ARS] at this time." DiScala's response was false -- Merrill was able to submit a bid and purchase the Anchorage ARS from Iconix but chose not to. Merrill had successfully offloaded those high-risk ARS onto Iconix and did not want them back because, as Merrill knew, they would soon be worthless.

### Iconix's $13 Million Investment Is Decimated

68. For the next 17 months, Merrill collected fees for managing Anchorage ARS auctions despite the failure of each and every one of those auctions. In or about January 2009, Merrill's Monoline Insurer client (the "Anchorage Monoline") caused all of the A1- and P1-rated assets to be liquidated, emptied all of Iconix's and other ARS investors' cash out of the Anchorage Facility Trust (the "Anchorage Trust"), and, in return, deposited its own illiquid, Monoline Preferreds. Thereafter, the Anchorage Trust was dissolved, Iconix's $13 million of Anchorage ARS were rendered worthless, and Iconix received in their place $13 million of illiquid Monoline Preferreds. Accordingly, in place of its $13 million investment in securities Merrill had represented as "money market-like investments," Iconix now has a $13 million equity stake in a Monoline Insurer.

69. As Merrill knew at the time it sold the Anchorage ARS to Iconix, an illiquid equity investment such as the Monoline Preferreds was contrary to Iconix's need to keep its acquisition capital liquid at all times. Moreover, Merrill knew that such an investment would contravene the Iconix Guidelines that Merrill had helped create as well as the Term Loan Covenants of which Merrill had first-hand knowledge. Merrill knew, or should have known, that for these reasons, Iconix would never have agreed to purchase the ABC ARS if it had known that there was even a remote possibility that those ARS could be converted to an illiquid equity stake

without Iconix's knowledge or consent. To add further insult to injury, on or about July 31, 2009, the Anchorage Monoline cut off all dividend payments to Iconix and all other holders of its Monoline Preferreds.

70. Merrill's egregious fraud has left Iconix holding Preferred Shares of the Anchorage Monoline that are encumbered by the unknowable panoply of risks that go along with insuring risky, complex, and illiquid credit derivatives tied to subprime mortgages and mysterious CDOs. Accordingly, the Monoline Preferreds can be sold only at a steep discount, if at all. Moreover, each and every day, Merrill's fraud robs Iconix of the return it would earn if its money were invested in a *bona fide* cash management instrument, rather than the Monoline Preferreds forced on it through Merrill's sham ABC ARS scheme.

## FIRST CLAIM

### (Fraud in Violation of Section 10(b) of the Securities and Exchange Act of 1934 and Rule 10b-5 Promulgated Thereunder)

71. Iconix incorporates by reference the allegations set forth in paragraphs 1 through 70 of this Complaint as if set forth fully herein.

72. Merrill intentionally and/or recklessly: (a) employed a device, scheme, and artifice to defraud Iconix with respect to the sale of the Anchorage ARS; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made not misleading; and/or (c) engaged in acts, practices, or courses of business which operated as a fraud and deceit upon Iconix in connection with the sale and purchase of the Anchorage ARS in violation of Section 10(b) of the Securities Act (15 U.S.C. § 78j(b)) and Rule 10b-5 promulgated thereunder. Merrill also engaged in a series of fraudulent and deceitful acts or practices.

73. As Merrill intended, Iconix reasonably relied upon Merrill's representations in deciding to purchase the Anchorage ARS for Iconix's accounts. Had Iconix known that the information it received from Merrill contained material misrepresentations, or had Iconix known the material adverse information that Merrill had concealed, Iconix would not have purchased the Anchorage ARS.

74. By reason of the foregoing, Iconix has been damaged and is entitled to judgment against Merrill for damages in an amount to be determined at trial, but not less than $13,000,000.

## SECOND CLAIM

### (Common Law Fraud)

75. Iconix incorporates by reference the allegations set forth in paragraphs 1 through 74 of this Complaint as if set forth fully herein.

76. With the intent of inducing Iconix to purchase the Anchorage ARS from Merrill, Merrill knowingly and/or recklessly made and participated in the making of material misrepresentations of fact, and knowingly and/or recklessly omitted to state material facts to Iconix, as set forth above.

77. Merrill intended that Iconix rely on its misrepresentations and concealments in purchasing the Anchorage ARS from Merrill, and Iconix reasonably and justifiably relied upon such misrepresentations and concealments.

78. By reason of the foregoing, Iconix has been damaged and is entitled to judgment against Merrill for damages in an amount to be determined at trial, but not less than $13,000,000.

## THIRD CLAIM

### (Violation of Section 12(a)(1) of the Securities Act)

79. Iconix incorporates by reference the allegations set forth in paragraphs 1 through 78 of this Complaint as if set forth fully herein.

80. The Anchorage ARS Merrill sold to Iconix are securities within the meaning of the Securities Act. Merrill acted as underwriter of such securities, offered such securities for sale, and sold such securities to Iconix within the meaning of the Securities Act.

81. Merrill offered and sold the Anchorage ARS by the use of the instrumentalities of interstate commerce. Merrill sold to Iconix ARS that were not registered with the SEC, as there was no effective registration statement as to those securities. There was no valid exemption in effect that permitted Merrill to underwrite the offer and sale of such securities without registration under the Securities Act.

82. Merrill did not inform Iconix that the Anchorage ARS were being offered pursuant to exemptions under Section 2(a)(51)(A) of the Investment Company Act, and Rule 144A under the Securities Act, respectively.

83. At all times, Merrill knew that Iconix was not a Qualified Purchaser or Qualified Institutional Buyer as those terms are defined in Section 2(a)(51)(A) of the Investment Company Act, and Rule 144A under the Securities Act, respectively.

84. Merrill's offer and sale of the Anchorage ARS violated Section 5 of the Securities Act. Accordingly, pursuant to Section 12 of the Securities Act (15 U.S.C. § 78(1)), Merrill is

liable to Iconix for the amount, not less than $13,000,000, Iconix paid for the Anchorage ARS, with interest thereon.

## FOURTH CLAIM

### (Negligent Misrepresentation)

85. Iconix incorporates by reference the allegations set forth in paragraphs 1 through 84 of this Complaint as if set forth fully herein.

86. Merrill negligently and carelessly made material misrepresentations and omitted material facts to Iconix in connection with the sale of the Anchorage ARS to Iconix.

87. Merrill should have known that these representations were false and misleading but failed to exercise due care in connection with said representations and omissions.

88. Iconix reasonably relied to its detriment upon Merrill's negligent misrepresentations and omissions of material fact by purchasing and the Anchorage ARS.

89. By reason of the foregoing, Iconix has been damaged and is entitled to judgment against Merrill for damages in an amount to be determined at trial, but not less than $13,000,000.

## PRAYER FOR RELIEF

WHEREFORE, Iconix requests that the Court grant judgment to Iconix:

(1) on the First through Fourth Claims awarding compensatory damages in an amount to be determined at trial;

(2) on the Second and Fourth Claims, awarding punitive damages in an amount to be determined at trial;

(3) awarding the costs, including interest and attorney's fees, associated with this action; and

(4) grant such other and further relief as the Court may deem just and proper.

**Trial by jury is demanded on all issues so triable.**

Dated: New York, New York
January 7, 2010

KASOWITZ, BENSON, TORRES
& FRIEDMAN LLP

By: /s/ Marc E. Kasowitz
Marc E. Kasowitz
Charles M. Miller

1633 Broadway
New York, New York 10019
(212) 506-1700

Attorneys for
Iconix Brand Group Incorporated